(English Translation – Wayuu People & Socrates Barros Fince)

Honorable: SCB
United States District Judge

Reference: Court Case of Socrates Barros Fince.

It is necessary to contextualize the location of Bahía Portete, which belongs to the town of Irraipa in the municipality of Uribia, also called and known as the indigenous capital of Colombia since it is the place where there is a greater concentration of indigenous population. As the name indicates Portete Bay is a natural bay that generally has a depth of 9 meters on the shore, this made it historically attractive and important for commercial exchanges and especially in the era of smuggling. In addition, Bahía Portete is a strategic place due to its location since it is located in the middle of Punta Gallinas and Cabo de Vela. On the south side of this mouth of the bay, Puerto Bolívar is located. This is a private shipping port where approximately 5,900 tons of coal are shipped as a result of the exploitation carried out in Cerrejón, the largest open pit coal mine in Latin America.

The Bahía Portete massacre (municipality of Uribia, in Alta Guajira), on April 18, 2004, involved a group of approximately 40 to 50 paramilitaries from the Wayuu counterinsurgency front of the Northern Block of the United Self-Defense Forces of Colombia (AUC) under command alias "Jorge 40", entered the territory of Portete in Alta Guajira, with list in hand, accompanied by local informants (women and men) and other men wearing Colombian army clothing, they toured the area torturing, burning, dismembering and murdering their victims while they looted houses as well as establishments and even desecrated cemeteries, caused serious violations of International Humanitarian Law and International Human Rights Law, all due to the development and within the context of the Colombian armed conflict.

This paramilitary route of terror through the territory left several women and men dead, 4 of the victims were women, numerous homes were destroyed and the massive displacement of more than 600 people, most of whom hid among fields and mangroves in the desert for some days.  In addition to the forced disappearance of a girl and a Wayúu leader (cousin and aunt of the accused) about whom there is no information 19 years later. There was a premeditated exercise of terror and violent subordination that crudely illustrates the interests, disputed resources, strategies, and repertoires of violence used by the paramilitaries to relate to the Wayuu community in this area.

Later, the survivors fled to Uribía, Maicao, and Riohacha to begin a long march through the desert to cross the border and seek humanitarian protection in Maracaibo, Venezuela.

Days and nights full of fear, pain, uncertainty, walking in the desert with fear and disorientation without understanding the reasons that marked the life of a community without exception of being a man, woman, adult or child.  Exiled from their own territory and who never imagined that the violence of more than 50 years of armed conflict that the country was experiencing could affect civilians and non-combatants, and especially in events where responsibility for actions and omissions by of members of the **public force** in these events, which acted against civil society.

In search of Justice, Truth and Non-Repetition, some of the direct victims of these events went to ordinary justice, for being acts of genocide (a Wayúu indigenous community) and crimes against humanity, and among other reasons, for there do not exist in our Wayuu normative systems (self-justice) ancestral references to such acts of barbarism that occurred.  Given the judicial scenario, they partially convicted some responsible parties, including Rodrigo Tovar alias "Jorge 40", Arnulfo Sánchez alias "Pablo" and José María Barros Ipuana alias "Chema bala" along with several of his

relatives; for the crimes of forced disappearance, homicide, torture, forced displacement, among others. There is still a lack of justice, especially regarding the responsibility and participation of members of the army and other people in the events.

The indigenous clan groups affected by these events are the Uriana and Epinayu, who have ancestrally inhabited the territory, in the territorial collective and our social composition within the community the leadership role was exercised by women in the community, always strong, forceful, and empowered. This made the aggressors focus their actions on the women of Bahía Portete precisely because they played a determining role in the community structure of the Wayúu on the cultural, economic and political levels. The action committed by the paramilitaries can be interpreted as a form of punishment against women who take an active role in the defense of their communities, not only as "mediators before the armed actors to demand their territorial autonomy and government, but also as challengers to their policies of domination." In the case of Bahía Portete, given the selective nature of the executed victims, it is possible to differentiate at least two objectives pursued by the paramilitaries: the first, to hit the internal leadership of the Wayuu by breaking the public roles of women, simultaneously spreading the terror from top to bottom. The second, converting women through repertoires of violence, particularly sexual violence, into a means to hurt the honor of Wayuu men, both in their masculinity and in their social role as warriors.

The sexual violence and torture described have instrumental purposes associated with three objectives: terrorizing the population; punish indigenous women leaders in a public and stark manner, by attacking their bodies; and cause forced displacement. The places, forms and temporalities in which this sexual violence was applied, added to the cultural transgressions that these entail, indicate that sexual violence was a means to achieve certain instrumental ends and that it also sought to break or circumvent the moral and social principles that they regulate gender relations and the treatment of the body in this ethnic group. In this sense,

sexual violence is registered and communicated as a specific form of ethnic violence and is committed in the specific context of seeking to destroy the territory (logic of extermination and subordination) of a specific ethnic group that constituted an obstacle to achieving paramilitary purposes regardless of whether this would lead to the disappearance of the people and their culture.

For the Wayuu people, women, children, and older adults are sacred, untouchable. When there have been wars or inter-clan conflicts, this gender approach is respected and is established in the Wayuu normative code. Women represent peace, dialogue, appeasement in conflict. What happened in the Bahia Portete massacre broke not only the social fabric of the community but also that of the Wayúu people and that of all the guajiros because they humiliated to subdue.

Among the murdered women are Margot Epinayu, Diana Fince Uriana (Missing), Reina Fince Pushaina (Missing and a minor at the time of the events) and Rosa Fince Uriana who exercised her role as a natural leader within the community; The latter dedicated herself to raising and playing the role of mother to **Sócrates Gabriel Barros Fince.**

With the massive displacement of the community, a crisis of emotional destabilization and psychosocial damage was suffered from children to the elderly, causing the new generations to lose their identity as Wayúu in their actions because there was a cultural clash between the Wayuu and the west.

For us Wayuu, the territory is part of our identity, it is the vital space where the social, spiritual, cultural, economic and political life of the Wayuu being develops. That is why the territory was never stopped being cared for, it was always visited and in commemoration the "yanamas" (translation unknown) were made that helped to exercise self-government and strengthen that connection with the territory, in

addition to carrying out activities to commemorate what happened and denounce the facts.

The main psychosocial impacts detected, among others, were disintegration of the family nucleus, loss of family cultural practices, moral, sociocultural and community damage, damage to the notion of justice and the institutions that represent it, altered and unfinished mourning with loss of trust between family and neighbors, change in the individual, collective and social life project.

The presence of psychological damage even five years after the experience of the massacre and the psychosocial impacts evidenced in the participants account for the prolonged, real, concrete and symbolic damage in a family and the community in cases of massacres, as well as the social cost, economic and mental health, taking into account the transgenerational impacts of trauma, especially in this type of experience, since the damages also affect the notions of justice and legality.

The Colombian Constitutional Court, in the follow-up orders to Sentence T-025 of 2004, has indicated that the historical conditions of serious and manifest violations of the rights of indigenous peoples have facilitated the Colombian armed conflict to produce differential impacts and effects on ethnic population groups, these being of special constitutional protection, as a priority "the greatest risk that looms over indigenous peoples, especially that of the extermination of some peoples, be it from a cultural point of view due to the displacement and dispersion of its members and from the physical point of view due to the natural or violent death of its members. (Auto 004 of 2009, Colombian Constitutional Court, on the protection of the fundamental rights of indigenous people and peoples affected by displacement, reflect a deep concern of the Constitutional Court and that is that the public policy built by the Colombian State to serve the different displaced populations, is consistent with the differences in sex, gender, age, and refers to the ethnocultural aspects of the people or communities who are victims of displacement and, in general, of the armed conflict.)

We must also keep in mind what Chacón pointed out "as one of the rights most affected by the violations of human rights and infractions of "DIH" (International Human Rights) committed against indigenous peoples, is the right to health, not only considered in its physical dimension, but in the impact on the emotional, mental and collective. This is one of the reasons for seeking that health be considered within the framework of this protocol, in its broadest nature, and take into account the worldview, uses and customs of indigenous peoples. The rehabilitation of the emotional and mental health of individuals must allow recovery at an individual and collective level, understanding this last level not as the sum of individual impacts but as the ability to reconstruct social networks and links, and to put into practice. question of learning, senses and cultural meanings, "the incorporation of psychosocial guidelines is unquestionable as an essential aspect that allows reparation to be considered in its integral dimension." Chacón Belalcázar, Ángela Andrea, *Scope of Collective Reparation In Colombia: Starting The Path*. Ombudsman's Office. National Printing Office of Colombia, 2010, pp. 12 to 15.

Taking care of the emotional well-being of victims is part of the right to health, as well as the right to the physical and psychological integrity of victims who have unjustly suffered abuses and humiliation. Failure to recognize this can even compromise the collective well-being of the affected indigenous peoples or communities. At the same time, the right to integrity must be observed from the moral and psychological aspect, since today the human being is an integral being that seeks not only physical but also psychosocial integrity.

The Inter-American Court of Human Rights, in different pronouncements and substantive rulings, has indicated measures aimed at guaranteeing the right to health, giving it a character of satisfaction and/or rehabilitation measures, when these seek to remedy emotional, psychological or psychiatric damage. produced by violations of human rights, their families and/or their social environment.

To cite some examples, in the ruling Barrios Altos v. Peru, the Inter-American Court ordered free coverage of health services for beneficiaries. In other rulings, it has ordered the concerned States to provide free medical, psychological and psychiatric treatment to the victims' families.

The Inter-American Court has also understood health as a measure of restitution, to the extent that it orders the State concerned to take measures to try to restore things to the state prior to the violations committed. For example, in the case of the Plan de Sánchez Massacre, the Inter-American Court ordered that medical, psychological and psychiatric treatment be provided to the survivors. This ruling is important as a jurisprudential precedent since Guatemala is a country with large indigenous groups and the systematic nature and type of violations that occurred, the reparation measures acquired a community dimension.

In a report on this case, regarding the mental health of the facts of this Judgment (Sanchez Plan), an approach is proposed from a psychosocial approach that has as its main reference the notion of group, understood as a place of protection and solidarity among all its members. The report indicates that from the self-help groups, with this community, issues such as impunity, the impact of the loss of roles, leadership, identity or replacement of traditional norms, distrust, fear, terror and silence were addressed. Some of the most important themes identified in the work refer to altered community mourning (the farewell of the dead), sexual violence, psychosomatic illnesses and the notion of reparation from those affected themselves (reparation seen from the community). It is concluded that "a proposal for community action and incidence must inevitably contain collective actions in favor of the recovery of identity and memory, the strengthening of social groups, and, additionally, identify the particular needs of the different age groups." and on the differences arising due to gender", and concludes, "an analysis of the facts object of the expert opinion far from the cultural context of the victims means ignoring the truth of what happened

and its scope, running the risk of concluding a revisionist thesis on what happened." Gómez, N. (2005), *Report On The Damage To Mental Health Derived From The Plan Sánchez Massacre, For The Inter-American Court Of Human Rights.* ECAP: Community studies and psychosocial action team 2005, Guatemala, Guatemala.

The Wayuu indigenous community of Portete, to which the defendant belongs, after 19 years of serious violations of Human Rights, continues in a process of return to the ancestral territory, -woumain-. It also seeks to recover the community life project and the social fabric, taking into account the Wayuu regulatory system, its own uses and customs, autonomy and internal organization, among other rights of indigenous peoples.

Within the comprehensive reparation, the measures of restitution, compensation, satisfaction, guarantees of non-repetition and rehabilitation already conceptually explained above are conceived. The massacre perpetrated against the Wayúu Indigenous Community in Bahía Portete affected both individual and collective rights, deteriorating the community and political project of autonomy in the violation of their territory, with the territory being recognized as a victim as it was not something immobile but a living being. from the worldview of the indigenous peoples. It destroyed the cultural balance and transformed the productive and economic activities of each member of the community. It weakened the self-government represented in their ancestral authorities (alaulayus) and in the same way the victimizing events such as forced disappearance , homicides, torture, sexual violence, divided family, clan (eirruku) and community networks. All of the above has repercussions on each member of the community, due to the destruction of the collective and individual life plan of a Wayúu indigenous person, which over time and outside the ancestral territory ended up increasing the damage by losing the notion of the BEING Wayúu at the origin of the mixture and interrelation with the Arijunas - or non-Wayúu - with the processing.

The violence and the years of waiting for justice, truth and reparation to arrive in the community of Portete, altered ceremonies and cultural celebrations, in such a way that put the survival of the community at risk. Such was the connotation of the violent events that even marked the history of the largest indigenous people in Colombia.

For the specific case regarding the defendant, it cannot be ignored that everything previously narrated, regarding the context, especially the effects caused when he was still a young man, influenced the formation and conception as initially the survival instinct, due because he was stolen from his ancestral territory, even leading to relationships with people who ended up manipulating and conditioning his actions. One must then keep in mind both the especially cultural conditions of belonging to the Wayuu indigenous people, but also the recognition as a victim of the armed conflict that ended up marking the actions deployed in recent years, in order to cope with the absence of their loved ones, trying to reconstruct the individual, family and community life plan.

As the sister of Sócrates Barros Fince, I state that our lives have been marked by the crude armed conflict that we experienced in Colombia and that marked our lives and that our worldview was affected, we apologize for his actions.

Sincerely,

(Signature)

Telemina Barros
E-Mail: mujertejiendopaz@yahoo.es