Doctora: Susan C. Bucklew

Juez de Distrito de los Estados Unidos

Referencia: Proceso judicial de Sócrates Barros Fince.

Es necesario hacer una contextualización del lugar de ubicación de Bahía Portete la cual pertenece al corregimiento de irraipa del municipio de uribía también llamada y conocida como la capital indígena de Colombia pues es el lugar donde hay una mayor concentración de población indígena, como el nombre indica Bahía Portete es una bahía natural que generalmente tiene una profundidad de 9 metros en la orilla, esto la hecho históricamente atractiva e importante para los intercambios comerciales y especialmente en la época del contrabando; además Bahía Portete es un lugar estratégico por su ubicación ya que se encuentra en la mitad de punta gallinas y del cabo de la vela en el lado sur de esta boca de la bahía está ubicado puerto bolívar este es un puerto privado de embarque que aproximadamente 5 mil 900 toneladas de carbón son despachadas producto de la explotación que se adelanta en el cerrejón, la mina de carbón a cielo abierto más grande de Latinoamérica.

La masacre de Bahía Portete (municipio de Uribia, en la Alta Guajira), el 18 de abril de 2004, incursionó un grupo aproximado de 40 a 50 paramilitares del frente contrainsurgencia Wayuu del Bloque Norte de las autodefensas unidas de Colombia (AUC) a mando de alias "Jorge 40", entró al territorio de Portete en la Alta Guajira, con lista en mano acompañados de informantes locales (mujeres y hombres) y otros hombres con prendas del ejército colombiano, recorren la zona torturando, quemando, desmembrando y asesinando a sus víctimas mientras saquean las casas así como los establecimientos e incluso profanan los cementerios, causando graves violaciones al Derecho Internacional Humanitario y al Derecho Internacional de los Derechos Humanos, todo en razón, desarrollo y contexto del conflicto armado colombiano.

Esta ruta de terror de los paramilitares por el territorio dejó varios muertos entre mujeres y hombres, 4 de las víctimas mujeres, numerosas viviendas destruidas y el desplazamiento masivo de más de 600 personas quienes en su mayoría se

escondieron entre cardones y manglares en el desierto por algunos días. Además de la desaparición forzada de una niña y una líder Wayúu (prima y tía del procesado) de la cual no se tiene información 19 años después. Hubo allí un premeditado ejercicio de terror y subordinación violenta que ilustra crudamente los intereses, los recursos en disputa, las estrategias, y los repertorios de violencia utilizados por los paramilitares para relacionarse con la comunidad wayuu de esta zona.

Posteriormente los sobrevivientes emprendieron la huida hacia Uribía, Maicao, Riohacha para iniciar una larga marcha por el desierto para cruzar la frontera y buscar protección humanitaria en Maracaibo, Venezuela.

Días y noches llenas de miedo, dolor, incertidumbre, caminar en el desierto con temor y desorientación sin entender las razones que marcaron la vida de una comunidad sin excepción de ser hombre, mujer, adulto o niño. Desterrados de su propio territorio y quienes nunca imaginaron que la violencia de más de 50 años de conflicto armado que vivía el país podía tocar a civiles y no combatientes, y sobre todo en hechos dónde incluso se ha demostrado la responsabilidad por acción y omisión de miembros de la **fuerza pública** en estos hechos, que actuaron en contra de la sociedad civil.

En búsqueda de la Justicia, la Verdad y la No Repetición, algunas de las víctimas directas de estos hechos acudieron a la justicia ordinaria, por ser conductas de genocidio (una comunidad indígena Wayúu) y delitos de lesa humanidad, y entre otras razones, por no existir en nuestros sistemas normativos Wayuu (justicia propia) referentes ancestrales a semejantes actos de barbarie ocurrida. Ante el escenario judicial parcialmente condenaron a algunos responsables, entre ellos Rodrigo Tovar "alías Jorge 40", Arnulfo Sánchez "alías Pablo" y a José María Barros Ipuana "alías Chema bala" junto con varios de sus familiares; por los delitos de desaparición forzada, homicidio, tortura, desplazamiento forzado, entre otros. Falta aún la materialización de justicia especialmente sobre la responsabilidad y participación de miembros del ejército y de otras personas en los hechos.

Los grupos claniles indígenas afectados por estos hechos son los Uriana y Epinayu, quienes hemos habitado ancestralmente el territorio, en el colectivo

territorial y nuestra composición social dentro de la comunidad se ejerció el rol de liderazgo por parte de las mujeres en la comunidad, siempre había sido fuerte, contundente, empoderadas, esto hizo que los agresores focalizaran sus acciones sobre las mujeres de Bahía Portete precisamente porque ellas cumplían en la estructura comunitaria de los Wayúu, un papel determinante en los planos cultural, económico y político. La acción cometida por los paramilitares se puede interpretar la violencia ejercida como una forma de castigo contra las mujeres que asumen un papel activo en la defensa de sus comunidades, no sólo como "mediadoras ante los actores armados para la reivindicación de su autonomía territorial y de gobierno, sino también como retadoras a las políticas de dominio de estos". En el caso de Bahía Portete, dado el carácter selectivo de las víctimas ejecutadas, es posible diferenciar al menos dos objetivos perseguidos por los paramilitares: el primero, golpear los liderazgos internos de los wayuu al quebrantar los roles públicos de las mujeres, difundiendo simultáneamente el terror de arriba hacia abajo. El segundo, convertir a las mujeres a través de los repertorios de violencia, en particular de la violencia sexual, en un medio para herir el honor de los hombres wayuu, ya sea en su masculinidad como en su rol social de guerreros.

La violencia y tortura sexual descritas tienen fines instrumentales asociados a tres objetivos: aterrorizar a la población; castigar de manera pública y descarnada a las mujeres indígenas lideresas, mediante el ataque a sus cuerpos; y provocar el desplazamiento forzado. Los lugares, formas y temporalidades en las que se aplicó esta violencia sexual, sumados a las trasgresiones culturales que estas acarrean, indican que la violencia sexual fue un medio para lograr ciertos fines instrumentales y que también buscaba romper o burlar los principios morales y sociales que regulan las relaciones de género y el trato del cuerpo en este grupo étnico. En este sentido, la violencia sexual está inscrita y se comunica como una forma específica de violencia étnica y se comete en el contexto específico de buscar arrasar el territorio (lógica de exterminio y subordinación) de un grupo étnico específico que se constituía en obstáculo para alcanzar los fines paramilitares sin importar que ello propiciara la desaparición del pueblo y su cultura.

Para el pueblo wayuu las mujeres, los niños, los adultos mayores son sagrados, intocables, cuando ha existido guerras o conflictos interclaniles se respeta a este enfoque de género y así está establecido en el código normativo wayuu; las mujeres representamos la paz, el diálogo, el apaciguamiento en el conflicto; con lo ocurrido en la masacre de bahía portete se rompió no solo el tejido social de la comunidad sino, también; el del pueblo Wayúu y el de todos los guajiros debido a que humillaron para doblegar.

Dentro de las mujeres asesinada se encuentra Margot Epinayu, Diana Fince Uriana (Desaparecida) Reina Fince Pushaina (Desaparecida y menor de edad al momento de los hechos) y Rosa Fince Uriana quien ejerció su rol de líder natural dentro de la comunidad; esta última se dedicó a criar y ejerció el rol de mamá de **Sócrates Gabriel Barros Fince.**

Con el desplazamiento masivo de la comunidad se sufrió una crisis de desestabilización emocional y un daño psicosocial desde los niños hasta los adultos mayores causando que las nuevas generaciones perdieran su identidad como Wayúu en su actuar debido a que existió un choque cultural entre la wayuu y la occidental.

Para nosotros los wayuu el territorio hace parte de nuestra identidad, es el espacio vital donde se desarrolla la vida social, espiritual, cultural, económica y política del ser wayuu. Por eso nunca se dejó de cuidar el territorio siempre se visitó y en conmemoración se hacían los yanamas que ayudaba a ejercer el gobierno propio y fortalecer ese arraigo con el territorio, además de realizar las actividades de conmemoración de lo sucedido y denuncia de los hechos.

Los principales **impactos psicosociales** detectados, entre otros, fueron desintegración del núcleo familiar, pérdida de las prácticas culturales familiares, daño moral, sociocultural y comunitario, daño en la noción de justicia y las instituciones que la representan, duelo alterado e inconcluso con pérdida de la confianza entre familiares y vecinos, cambio en el proyecto de vida individual, colectivo y social.

La presencia de daño psicológico incluso cinco años después de la vivencia de la masacre y los impactos psicosociales evidenciados en los participantes dan cuenta del daño prolongado, real, concreto y simbólico en una familia y la

comunidad en casos de masacres, así como del costo social, económico y en la salud mental, teniendo en cuenta los impactos transgeneracionales de los traumas, especialmente en este tipo de vivencias, pues los daños afectan además las nociones de justicia y legalidad.

La Corte Constitucional Colombiana en los autos de seguimiento a la Sentencia T-025 de 2004, ha señalado que las condiciones históricas de violaciones graves y manifiestas de los derechos de los pueblos indígenas han facilitado que el conflicto armado colombiano, produzca impactos y afectaciones diferenciales en los grupos étnicos poblacionales siendo estos de especial protección constitucional, de manera prioritaria "el mayor riesgo que se cierne sobre los pueblos indígenas, en especial, el del exterminio de algunos pueblos, sea desde el punto de vista cultural en razón al desplazamiento y dispersión de sus integrantes como desde el punto de vista físico debido a la muerte natural o violenta de sus integrantes. (Auto 004 de 2009, Corte Constitucional Colombiana, sobre protección de los derechos fundamentales de las personas y pueblos indígenas afectados por el desplazamiento, dan cuenta de una preocupación profunda del Tribunal Constitucional y es que la política pública construida por el Estado colombiano para atender a las diferentes poblaciones desplazadas, sea consistente con las diferencias de sexo, de género, de edad, y referidas a los aspectos etnoculturales de las personas o comunidades víctimas del desplazamiento y, en general, del conflicto armado.)


Debemos también tener de presente lo señalado por Chacón "como uno de los derechos más afectados con las vulneraciones de derechos humanos e infracciones al DIH cometidos contra los pueblos indígenas, es el derecho a la salud, no solo considerado en su dimensión física, sino en el impacto sobre lo emocional, lo mental y lo colectivo. Esta es una de las razones para buscar que la salud sea considerada en el marco del presente protocolo, en su carácter más amplio, y tome en cuenta la cosmovisión, usos y costumbres de los pueblos indígenas. La rehabilitación de la salud emocional y mental de los individuos debe permitir una recuperación a nivel individual, y colectivo entendiendo este último nivel no como la sumatoria de los impactos individuales sino como la capacidad de reconstruir las redes sociales y los vínculos, y de poner en cuestión aprendizajes, sentidos y significados culturales, "es incuestionable la incorporación de lineamientos psicosociales como aspecto esencial que permita

considerar la reparación en su dimensión integral" *Chacón Belalcázar, Ángela Andrea. Alcances de la reparación colectiva en Colombia: iniciando el camino. Defensoría del Pueblo. Imprenta Nacional de Colombia, 2010, págs. 12 a 15.*

La atención del bienestar emocional de las víctimas forma parte del derecho a la salud, como del derecho a la integridad física y psicológica de las personas víctimas que injustamente han padecido atropellos y vejaciones. Al no reconocer esto puede incluso comprometer el bienestar colectivo de los pueblos o comunidades indígenas afectados. Al mismo tiempo, el derecho a la integridad debe observarse desde el aspecto moral y psicológico, ya que hoy día el ser humano es un ser integral que busca no solo la integridad física sino también psicosocial.

La Corte Interamericana de Derechos Humanos, en diferentes pronunciamientos y sentencias de fondo ha señalado medidas orientadas a garantizar el derecho a la salud, dándole un carácter de medidas de satisfacción y/o de rehabilitación, cuando estas buscan subsanar un daño emocional, psicológico o psiquiátrico producido por las violaciones a los derechos humanos, a sus familiares y/o a su entorno social.

Para citar algunos ejemplos tenemos que en la sentencia Barrios Altos contra Perú, la Corte IDH ordenó la cobertura gratuita de servicios de salud para los beneficiarios. En otras sentencias ha ordenado a los Estados concernidos disponer el tratamiento médico, psicológico y psiquiátrico gratuito a los familiares de las víctimas.

La Corte IDH también ha entendido la salud como medida de restitución, en la medida en que ordena al Estado concernido tomar las medidas para tratar de restituir las cosas al estado anterior a las violaciones cometidas. Por ejemplo en el caso de la Masacre de Plan de Sánchez, la Corte IDH ordenó proveer tratamiento médico, psicológico y psiquiátrico a las personas sobrevivientes. Esta sentencia es importante como antecedente jurisprudencial ya que al ser Guatemala un país con grandes grupos indígenas y al carácter sistemático y al

tipo de violaciones sucedidas, las medidas de reparación adquirieron una dimensión comunitaria.

En un informe sobre esta caso, acerca de la salud mental de a partir de los hechos de esta Sentencia (Plan de Sánchez) se propone un abordaje desde el enfoque psicosocial que tiene como principal referente la noción de grupo, entendido como lugar de protección y solidaridad entre todos sus miembros. El informe señala que desde los grupos de autoayuda, con esta comunidad se abordaron temas como la impunidad, el impacto de la pérdida de roles, liderazgo, identidad o sustitución de normas tradicionales, desconfianza, miedo, terror y silencio; algunos de los temas más importantes identificados en el trabajo refieren al duelo alterado comunitario (la despedida de los muertos), violencia sexual, enfermedades psicosomáticas y la noción de reparación desde los propios afectados (la reparación vista desde la comunidad) . Se concluye que "una propuesta de acción e incidencia comunitaria debe contener indefectiblemente acciones de carácter colectivo a favor de la recuperación de la identidad y la memoria, el fortalecimiento de los grupos sociales, y, adicionalmente, identificar las necesidades particulares de los distintos grupos etarios y sobre las diferencias derivadas en razón del género", y termina, "un análisis de los hechos objeto del peritaje lejos del contexto cultural de las víctimas significa ignorar la verdad de lo sucedido y sus alcances, corriendo el riesgo de concluir una tesis revisionista sobre lo acontecido" . **Gómez, N. (2005) Informe sobre el daño a la salud mental derivado de la masacre de Plan Sánchez, para la Corte Interamericana de Derechos Humanos. ECAP: Equipo de estudios comunitarios y acción psicosocial 2005, Guatemala, Guatemala.**

La comunidad indígena Wayuu de Portete, a la cual pertenece el procesado, después de 19 años de las graves violaciones a los Derechos Humanos, continúa en un proceso de retorno al territorio ancestral, -woumain-, aún tiene graves daños y afectaciones por restaurar, especialmente las secuelas a nivel individual y colectivo en cuanto a lo psicosocial, teniendo de presente el enfoque diferencial étnico. Se busca también, recuperar el proyecto de vida comunitario y el tejido social, tomando en cuenta el sistema normativo wayuu, los usos y

costumbres propias, la autonomía y la organización interna, entre otros derechos de los pueblos indígenas.

Dentro de la reparación integral se conciben las medidas de restitución, indemnización, satisfacción, garantías de no repetición y la rehabilitación ya anteriormente explicadas conceptualmente. La masacre perpetrada a la Comunidad Indígena Wayúu en Bahía Portete, afectó tanto los derechos individuales como colectivos, deterioró el proyecto comunitario, político de autonomía en la vulneración a su territorio, siendo el territorio reconocido como víctima al no ser algo inmóvil sino un ser vivo desde la cosmovisión de los pueblos indígenas, destrozó el equilibrio cultural y transformó las actividades productivas y económicas de cada miembro de la comunidad, debilito el gobierno propio representado en sus autoridades ancestrales, (alaulayus) y de igual manera los hechos victimizantes como la desaparición forzada, los homicidios, la tortura, la violencia sexual, fraccionaron las redes familiares, claniles (eirruku) y comunitarias. Todo lo anterior repercutiendo en cada miembro de la comunidad, debido a la destrucción del plan de vida colectivo e individual propio de un indígena Wayúu, el cual por el pasar del tiempo y por fuera del territorio ancestral terminó incrementando el daño al perder la noción del SER Wayúu al originarse la mezcla e interrelacionamiento con los Arijunas- o no wayúu- con el procesado.

La violencia y los años de espera para que llegue la justicia, la verdad y la reparación en la comunidad de Portete, alteraron ceremonias y celebraciones culturales, de tal forma que puso en riesgo la supervivencia de la comunidad. Tal fue la connotación de los hechos violentos que incluso marco la historia al mayor pueblo indígena de Colombia.

Para el caso en concreto en cuanto al procesado, no se puede desconocer que todo lo anteriormente narrado, sobre el contexto en especial de las afectaciones causadas cuando aún era un joven, incidieron en la formación y concepción en cuanto inicialmente el instinto de sobrevivencia, debido a que fue sustraído del territorio ancestral, conllevando incluso a relacionarse con personas que terminaron manipulando y condicionando su actuar. Se debe entonces tener

presente tanto las condiciones especialmente culturales por pertenecer al pueblo indígena Wayuu, pero además el reconocimiento como víctima del conflicto armado que terminó marcando durante los últimos años las acciones desplegadas, en aras de sobrellevar la ausencia de sus seres queridos, tratando de reconstruir el plan de vida individual, familiar y comunitario.

Como hermana de Sócrates Barros Fince, manifiesto que nuestras vidas se han marcado por el crudo conflicto armado que vivimos en Colombia y que marco nuestras vidas y que nuestra cosmovisión se vio afectada, pedimos disculpa por su accionar.

Atentamente,

Telemina Barros

Mail: mujertejiendopaz@yahoo.es